**E-FILED**
Wednesday, 01 August, 2012 03:52:55 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STEPHANIE D. WATTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-cv-3225 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Stephanie Watts appeals from the denial of her application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Watts has filed her Motion for Summary Judgment (d/e 15), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 17).  The parties consented, pursuant to 28 U.S.C. § 636(c), to have this matter proceed before this Court.  <u>Consent to Proceed Before a United States Magistrate Judge, and Order of Reference entered October 14, 2011 (d/e 6)</u>.  For the reasons set forth below, the decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Watts was born on September 2, 1985.  She has a tenth grade education and has worked as a personal assistant and a produce worker. She last engaged in substantial gainful activity in August 2008.  After that time, she worked briefly part time as a cleaner in a elderly care home in May 2009.   Answer to Complaint (d/e 12), attached Certified Copy of Transcript of Record of Proceedings (R.), at 53, 89.

Watts suffers from severe headaches.  On August 22, 2007, Watts went to Blessing Hospital in Quincy, Illinois, complaining of headaches accompanied by nausea and vomiting.  R. 363.  She reported that she smoked.  R.  363.  Watts underwent CT scans on June 20, 2007, and August 21, 2007.  Both showed a suspicious lesion in her brain.  R. 363, 371.  Watts told doctors that she had suffered from bad headaches since grade school.  R. 365.  She reported that she dropped out of school in the eighth grade.  R. 365.  An MRI without contrast showed no acute intra cranial process and did not reveal any major complications.  R. 366, 368, 371.  The emergency room doctors recommended an MRI with contrast. Watts declined and left the hospital on August 24, 2007, against medical advice.  R. 368.

On September 8, 2008, Watts went to the emergency room at Pike County Memorial Hospital in Louisiana, Missouri, for headaches.  R. 420-

25.  The diagram in the notes on September 8, 2008, showed the headache located on right side of the back of her head.   She was advised to quit smoking.  R. 421.  The emergency room doctor instructed Watts to see a neurologist.  R. 421.  On September 9, 2008, the emergency room doctors administered migraine medication.  Watts reported feeling better and was released.  R. 424-25.

On September 13, 2008, Watts went to the Pike Medical Clinic in Louisiana, Missouri, for severe, chronic headaches.  R. 374.  She reported that she has been having headaches for three years.  Watts reported that she had been scheduled to see a neurologist in January 2008, but did not go because she was managing her headaches on her own with Vicodin. The Clinic physician prescribed Nubain/Phenergan and Predniane and referred Watts to a neurologist.  R. 374.

On September 20, 2008, Watts went to the emergency room at Pike County Memorial Hospital.  She complained of a headache that had lasted for three days.  R. 413.  The diagram in the notes showed that the headache was on the right front side of her head and across the back of her head in the area above the ears.  R. 415.  She reported that she had scheduled an appointment with a neurologist.  The emergency room doctor gave her an injection of Nubain, directed her to stay on her current medications, and released her.  R. 417-18.

On September 22, 2008, she returned to the Pike Medical Clinic complaining of headaches.  She reported that the medication was not working.  The notes state that she must keep the scheduled appointment with the neurologist.  Fioricet with codeine was added to her medication.  R. 373.

On September 23, 2008, Watts went to the emergency room at Pike County Memorial Hospital again complaining of headaches.  R. 384.  She was again advised to quit smoking.  A CT scan with and without contrast showed a nonenhancing hypodensity in the brainstem, which had not changed from previous studies in 2007.  R. 392, 570.  Watts left the emergency room against medical advice after refusing IV medication treatment for her headaches.  R. 382.

On October 6, 2008, Watts went to see neurologist Dr. Cecile Becker, M.D., at Springfield Clinic in Springfield, Illinois.  Watts complained of daily migraine headaches, dizziness, nausea, vomiting, sense sensitivity, right-eye blurry vision, and burning on the right side of her face.  R. 570.  The neurological assessment was normal.  R. 571-72.  She was counseled to discontinue caffeine and smoking.  She was given prescriptions for Verapamil and Isometheptene.  Dr. Becker recommended an MRI scan.  R. 572.  No MRI was performed at that time.

On December 30, 2008, Watts underwent a consultative psychological evaluation with a clinical psychologist, Dr. Frank Froman, Ed.D.  R. 578-81.  Watts told Dr. Froman that she dropped out of school her freshman year of high school.  She reported that she was a "hell raiser" as a teenager who drank excessively.  She reported that she had now settled down and no longer drank alcohol.  She reported that she currently suffered from daily headaches.  R. 578.  She reported that she used no medication at the time because she could not afford them.  R. 578.  She reported that she could neither read nor write.  R. 580.  Dr. Froman opined that Watts was unlikely to be able to perform one and two-step assemblies at a competitive rate; she had minimal ability to relate adequately to co-workers and supervisors; she could understand oral instructions but not written ones; and she could withstand minimal stress associated with the work she was performing as a home health care worker.  Dr. Froman opined that if she found a way to manage her headaches, she could expand her range of work.  R. 580.

On July 29, 2009, Watts saw Dr. Joseph Kozma, M.D., for a consultative examination.  R. 603-08.  Watts reported frequent headaches that she has been having for at least a year.  Watts reported that she was not taking any medication at the time of the examination.  R. 603.  Dr. Kozma's examination was unremarkable, including the fact that he

found no neurological deficits.  R. 604-07.  Dr. Kozma diagnosed Watts

with mixed-type headaches, possibly predominantly migraine type but also

tension headaches.  R. 607-08.

On September 7, 2009, Watts went to the Illini Community Clinic in

Pittsfield, Illinois.  R. 649.  The diagram in the notes showed that the

headache was on the front of the right side of her head.  R. 654. Watts was

treated and released.  R. 651-52.

On October 27, 2009, she returned to the Illini Community Clinic

complaining of headaches.  The diagram in the notes showed that the

headache was on the front of the left side of her head.  R. 675.  She was

given injections of Nubain and Phenergan and reported that her headache

pain was resolved.  R. 673.

On October 28, 2009, Watts went to the Pike County Hospital in

Pittsfield, Illinois, for headaches, sinus congestion, and nausea.  R. 717.

Watts reported headaches on the left side of her head.  R. 722.  She

reported that the pain started the day before on October 27.  She was

given Demerol, Zofran, Augmentin, Benadryl, Zyrtec, Flonase, and Ultram

and released.  R. 720-21.

On December 4, 2009, Watt's primary care physician Dr. Casey

Jennings, M.D., completed a form entitled Headaches Residual Functional

Capacity Questionnaire (R. 680-85).  Dr. Jennings reported that he was her

primary care physician since August 2007.  He stated that he had seen Watts approximately four times a year.  He stated that Watts had daily headaches.  He stated that the approximate duration of her headaches was four years.  R. 681.  He stated that Watts was diagnosed with migraine headaches and an unspecified brain lesion.  He stated that further imaging was needed for a diagnosis.  He stated that she was taking Ibuprofen for her headaches at the time that he completed the questionnaire.  He opined that she could not work while she had a headache.  He opined that she would need unscheduled breaks once a day when she had headaches and the breaks would last for at least an hour.  R. 683.  He opined that she would be absent from work more than four times a month because of headaches.  R. 684.  He opined, however, that she would be capable of low stress jobs.  R. 684.

On December 9, 2009, Watts underwent an MRI with and without contrast.  The MRI showed no changes from the prior imaging and no significant findings.  R. 690.

On August 5, 2010, the Administrative Law Judge (ALJ) held an evidentiary hearing.  R. 50-97.  The hearing was held by video conference.  Watts and her attorney appeared in Hannibal, Missouri.  The ALJ was in Chicago, Illinois.  A medical expert, Dr. James M. McKenna, M.D.,

appeared by telephone, and a vocational expert Edward F. Pagella, also appeared by telephone.  R. 13.

Watts testified that she last worked in May 2009.  She performed housecleaning part time at home for elderly people.  R. 53.  She testified that she had a tenth grade education and did not have a GED.  R. 53-54. Watts testified that she had no limitations on her ability to stand or sit; she could walk half a mile; she could crouch; she could not crawl because her wrists gave out; she could reach overhead, out to the side, and in front; she could lift five pounds; she could lift a gallon of milk with her left hand, but not her right; she could only lift a glass of milk with her right hand.  R. 65-66.  Watts testified that she could drive as long as she wore her glasses. R. 66.  She testified, though, that she started having problems if she drove for longer than thirty minutes.  R. 77.  Watts testified that she could carry five pounds ten paces and could push or pull a cart carrying five pounds. Watts testified that she could use a computer keyboard without difficulty. R. 67.  Watts testified she had no trouble picking up small objects like nickels and dimes.  R. 68.  She also testified that she had no trouble with her senses other than needing to wear glasses.  R. 68.

Watts testified that she last went to the emergency room because of her headaches in early 2010, six to seven months before the hearing.  She testified that she last went to see a doctor about her headaches in

November 2009.  R. 68-69.  Watts initially said that in the last two years

she reported having headaches to Dr. Jennings about fifty times.  She then

changed her answer to twenty or twenty-five times.  R. 69.  Watts testified

that Dr. Jennings prescribed blood pressure medicine, pain killers, and

anti-inflammatories.  R. 70.  She said that she was taking anti-inflammatory

medication and Tylenol 3 six months before the hearing.  R. 70.  She

testified that she had not taken any prescription medication in the six

months before the hearing, however, because she could not afford to go

see the doctor.  R. 70-71.  She testified that she took Advil at the time of

the hearing.  She took two tablets three times a day.  R. 78-79.  No doctor

prescribed the Advil.  R. 79.

     Watts testified that bright lights could cause her to get headaches.

R. 71.  She also got headaches if she stared at a television too long or

intently, or if the television was too loud.  R. 75.  She testified that, "I can't

listen to music, watch TV, vacuum.  Go outside on sunny days."  R. 81.

She also got headaches from reading or staring at something too long or

too intently.  R. 76.  She also woke up in the middle of the night almost

every night with a throbbing headache.  R. 77.  She testified that she

cannot go back to sleep and is very tired in the morning.  R. 78.  She

testified that Dr. Jennings recommended more testing, but she had not

undergone the testing.  R. 72.

Watts testified that she got headaches two to three times a day.  She said that the headaches last two to six hours.  She testified that she went to the hospital, "When they start making my eyes go blurry, and it's real throbbing, pressure pain."  R. 72.  She testified that she also went to the hospital when the headaches made her nauseous, "I will puke, and it is intensive, sharper pain, more throbbing."  R. 73.  She testified that when her eyes go blurry, the symptoms last for about an hour.  She can see, "but it's a struggle."  R. 73.  Watts testified that she got nauseated from the headaches all the time.  R. 74.

Watts testified that other times when she got a headache she lay in bed in a dark room with warm water bottles or heating pads. R. 73.  She also took hot baths and alternated cold and hot packs.  R. 74.  She tried to get away from other people when she had a headache because of the noise that the people make.  R. 79.

She testified that she started having headaches when she was ten years old.  She testified that the headaches had been getting worse, especially the last three years.  R. 76.  Watts testified that when she had a headache, she could not do household chores.  R. 75.

Watts testified that she was married.  Her husband worked full time, but did not have health insurance.  They owned a house.  She did not receive any food stamps or other governmental assistance.  R. 80.

The medical expert Dr. McKenna testified that the evidence was inconclusive regarding whether Watts' impairments met any Listing in the Social Security regulations.  R. 59.  The Social Security regulations contain a listings of severe impairments that render a person disabled regardless of the person's age, education, and work experience.  20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  Dr. McKenna noted that the lesion in the mid brain had decreased in size.  He also opined that a lesion in the mid brain was not likely to cause a headache.  R. 56-57.  Dr. McKenna also noted that the medical records from the September 17, 2009, emergency room visit showed a headache on the right side, but the records from the October 27, 2009, emergency room visit show a headache on the left side.[1] Dr. McKenna said that this was not consistent with migraine headaches. R. 57.

Dr. McKenna also opined that the documentation did not show the consistency of headaches necessary to meet a Listing.  R. 59-60.  He stated that the documentation would have to show eight headaches per month for long periods of time to have the intensity necessary to meet a Listing.  R. 61.[2]  He noted that Dr. Jennings stated that Watts had daily

---

[1]Dr. McKenna referenced the September 7, 2009, visit to Illini Community Clinic rather than a visit on September 17, 2009.  R. 57.  The September 7 visit contains a diagram that shows the headache on the front of the right side of the head.  R. 654.

[2]Neither the ALJ nor the parties have cited a Listing for migraine headaches, and the Court has not been able to identify one.  Dr. McKenna references Listing 11.30, but

headaches, but Dr. Jennings' notes in Watts' medical files did not support

this statement.  Dr. Jennings' notes did not contain any record of these

headaches.  R. 63-64.  Dr. McKenna noted that Watts was receiving more

treatment for sinus problems rather than migraine headaches.  R. 61-62.

Based on this evidence, Dr. McKenna opined that Watts did not meet a

Listing for headaches, "Your Honor – I don't find the evidence that

convincing for, for a significant recurrent headache, Your Honor.  I just

don't see it."  R. 58.

Dr. McKenna agreed with Watts' counsel, however, that the medical

records indicated that Watts' headaches caused vomiting and blurry vision.

R. 82.  He opined that blurry vision was consistent with migraine

headaches.  R. 82.  Dr. McKenna further agreed that Watts' had an

impairment.  He opined, however, that the documentation did not support a

finding of significant migraine headaches.  R. 83.

Dr. McKenna opined that Watts had the residual functional capacity

to lift ten pounds frequently and twenty pounds occasionally.  He opined

that Watts could sit or stand for six hours in an eight-hour day, climb stairs

---

that Listing is for epilepsy.  See R. 59; 20 C.F.R. Part 404 Subpart P, Appendix 1 §
11.03.  Watts' lawyer at the hearing referenced Listing 11.07, but that Listing addresses
cerebral palsy.  See R. 55; 20 C.F.R. Part 404 Subpart P, Appendix 1 § 11.07.  Section
11 of the Listings generally covers neurological problems, but does not appear to
contain a Listing specifically addressing migraine headaches.

frequently, make other postural changes and balance frequently, but would not be able to used ladders, ropes, and scaffolds.  R. 64.

The vocational expert Edward Pagella testified last.  The ALJ asked Pagella about a hypothetical person with Watts' age, education, and work experience who could lift and carry 10 pounds frequently and 10 pounds occasionally; walk half a mile at a time; repetitively use both hand and foot controls; perform repetitive fingering, handling, reaching, including overhead reaching; occasionally kneel; never crouch or crawl; and never use ladders, ropes, or scaffolds; and understand, remember and perform only simple repetitive tasks due to occasional migraine headaches.  The ALJ told Pagella to assume the hypothetical person could only maintain attention and concentration for short periods and would need a break after two hours.  The hypothetical person would be limited to unskilled tasks and would have only intermittent interaction with the general public.  The person would only tolerate routine expected changes in the workplace and would need indirect lighting.  Finally, the person would be off five percent of the workday and would lose five percent of her productivity due to headaches.  R. 90-91.  The ALJ asked if such a person could perform Watts' past relevant work.  Pagella opined that such a person could perform the past relevant work.  He also opined that such a person could perform sedentary work such as hand inspector, bench assembler, and

bench packager.  Pagella opined that 98,000 hand inspector positions exist nationally and 2,400 exist in the local economy.  He opined that 106,000 bench assembler positions exist in the national economy and 3,200 in the local economy.  He opined that 113,000 bench packager jobs exist nationally and 4,300 in the local economy.  R. 92.  Pagella opined that these positions were unskilled sedentary positions.  R. 92.

On cross examination, Pagella opined that the hypothetical person could not perform these jobs if the person could not perform repetitive actions.  R. 93-94.  Pagella also opined that if the person could not work for one hour per day at an unspecified time then no work would be available for that person.  R. 96.  The ALJ then concluded the hearing.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued his decision on September 24, 2010.  The  ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of the claimant's age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  The

claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the claimant not to be able to return to his prior work considering his Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Watts met her burden at Steps 1 and 2 of the Analysis.  She was not engaged in substantial gainful activity and she suffered from a substantial impairment due to her migraine headaches. R. 15.  The ALJ determined at Step 3 that the severity of Watts' impairment did not meet any Listing.  R. 17.

At Step 4, the ALJ found that Watts had the RFC:

> to lift and carry 10 pounds frequently; sit, stand, and walk for an unlimited amount of time; repetitively use hand/arm/foot/leg controls, feel, finger, handle, and reach; never climb ladders, ropes, and scaffolding, crouch, or crawl; occasionally kneel; frequently climb ramps and stairs, balance, and stoop; avoid concentrated exposure to extreme temperatures and non-direct light; perform simple, repetitive, unskilled tasks; maintain concentration for 2 hour periods; intermittently interact appropriately with others; and stay on-task and productive for 95% of the work day.

R. 17.  In making this finding, the ALJ considered Watts' testimony about her symptoms.  The ALJ found that Watts' testimony about the "intensity, persistence, and limiting effects of these symptoms" was not credible.

R. 18.  The ALJ noted that Watts decided on her own to discontinue using prescribed medications to treat her headaches.  The ALJ noted that Watts stated that she stopped various medications and did not undergo tests and treatments because of financial problems.  The ALJ found that these statements were inconsistent with her refusing to undergo tests and treatment offered to her and leaving hospitals against medical advice.  The ALJ also found that Watts demonstrated that she knew how to receive medical treatment from emergency rooms and clinics.  R. 18-19.  The ALJ stated, "The claimant's unwillingness to follow-through undermines her allegations of a severely disabling impairment."  R. 19.

The ALJ also relied on other inconsistencies in the record to question Watts' credibility.  The ALJ noted that Watts alleged at one point that she had an eighth grade education when in fact she had a tenth grade education.  Watts told consultative examiners that she did not know how to read or write, but testified that she got headaches from reading.  R. 19.

The ALJ also relied primarily on Dr. McKenna's opinions in making his RFC finding.  R. 19-20.   The ALJ found that Dr. Jennings' opinions were not supported by evidence in the record.  The ALJ found that his opinions were inconsistent with his failure to conduct an MRI of Watts. The ALJ noted that Dr. Jennings stated that such imaging was necessary, but he did not order such imaging for two years.  R. 20.  The ALJ rejected Dr. Froman's opinions.  The ALJ stated that Dr. Froman relied on Watts' statements and so his opinions were unsubstantiated.  R. 20.  The ALJ also put little weight on several other physicians who performed consultative examinations and evaluations.  R. 20.

After determining the RFC, the ALJ found at Step 4 that Watts could perform her past relevant work.  The ALJ also found at Step 5 that Watts could perform a substantial number of jobs that exist in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Pagella.  R. 22.  The ALJ thus found that Watts was not disabled.

<u>THE DECISION OF THE APPEALS COUNCIL</u>

Watts appealed to the Appeals Council.  On May 18, 2011, the

Appeals Council issued a Decision.  R. 4-8.  The Appeals Council affirmed

the ALJ's findings at Steps 1 through 3 of the Analysis.  The Appeals

Council, however, modified the RFC finding to correct, "the variation in

wording between the residual functional capacity as it was defined in the

decision and as it was defined by the Administrative Law Judge at the

hearing."  R. 5.  The Appeals Council found that Watts had the following

RFC:

> [T]he claimant can lift and carry 10 lbs. frequently; sitting and
> standing are unlimited; is able to walk a half a mile; has
> repetitive use of hand, arm and foot controls; repetitive feeling,
> fingering, handling, reaching, including reaching overhead;
> never climbing ladders, ropes or scaffolds; frequently climb
> ramps and stairs; frequently balance; limited to understanding,
> remembering and carrying out simple repetitive tasks with
> attention and concentration for 2 hours with a break after 2
> hours; only intermittent interaction with the general public; has
> ability to respond to routine expected changes in the workplace;
> can stay on task and productive 95% of the workday; should
> avoid concentrated exposure to heat, cold, high humidity; and
> the lighting condition best suited would be that of non-direct
> light.

R. 5.

Based on the revised RFC, the Appeals Council found that Watts

could not perform her past relevant work at Step 4.  The Appeals Council

relied on Pagella's opinion that her past relevant work was at the light to

medium level, but the person in the ALJ's hypothetical question could only

perform sedentary work.  R. 5.  The Council, however, found at Step 5 that

Watts could perform a substantial number of jobs that exist in the national

economy.  R. 6.  The Appeals Council relied on Pagella's testimony and

the Medical-Vocational Guidelines.  R. 6.  The Appeals Council, thus,

affirmed the decision of the ALJ that Watts was not disabled.  R. 6-7.

Watts then filed this action seeking judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  In making this review, the

Court considers the evidence that was before the ALJ.  Wolfe v. Shalala,

997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate" to

support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment.  Delgado v. Bowen,

782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008).  The ALJ must articulate at least minimally his analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The Commissioner's decision is supported by substantial evidence.
Dr. McKenna's opinions support the findings at Step 3 that Watts did not
meet any Listing, and the Appeals Council's RFC finding.  Watts' testimony
regarding her ability to sit, stand, walk, and use her arms and legs also
supports the ALJ RFC finding.  Pagella's opinions support the finding at
Step 5 that Watts could perform a substantial number of jobs that exist in
the national economy.

Watts argues that the ALJ erred in failing to give controlling weight to
Dr. Jennings' opinions.  A treating physician's medical opinion is entitled to
controlling weight when it is well supported by medically acceptable clinical
and diagnostic techniques and is reasonably consistent with the other
substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); SSR 96-
2p.  The ALJ did not err in finding that Dr. Jennings' opinions were not
supported by diagnostic techniques and were not consistent with other
evidence in the record.  Dr. Jennings stated that an MRI needed to be
performed to confirm his diagnosis.  Thus, the ALJ could conclude that the
diagnosis was not confirmed, and so, was not supported by acceptable
diagnostic techniques.  Dr. Jennings' opinions are also inconsistent with
the evidence in the record that Watts' headache switched sides of her head
from September 7, 2009, to October 27, 2009, and Dr. McKenna's opinion
that migraine headaches do not switch sides of the head in this manner.

Dr. Jennings also stated that Watts had daily headaches.  Watts testified that she reported twenty to twenty-five times to Dr. Jennings that she was suffering from headaches.  Watts failed to produce treatment notes from Dr. Jennings to document these alleged contacts about headaches.  The ALJ could reasonably conclude Dr. Jennings' treatment notes would reflect at least some of these contacts.  The ALJ could rely on the absence of such notes to conclude that Watts' testimony was not credible on this point.  The ALJ could properly conclude from the lack of documentation that Dr. Jennings' statements about the frequency of the headaches was not based on by any medically accepted medical and diagnostic technique, but on Watts' personal representations about her history of headaches.

Dr. Jennings further stated that Watts' headaches have persisted for four years; however, he had been her treating physician for slightly less than two and one-half years, from August 2007 to December 2009, when he rendered his opinions.  Watts further provided no medical records of any diagnosis or treatment of headaches before August 2007.  The ALJ could again properly conclude that Dr. Jennings' opinion that Watts' headaches had persisted for four years was not well supported by medical and diagnostic techniques, but again was based on Watts' personal representations about her history.  The ALJ, thus, could properly conclude

that Dr. Jennings' opinions about the severity and the frequency of Watts'
headaches were well not supported by medically acceptable clinical and
diagnostic techniques, and so, were not entitled to controlling weight.

Watts next argues that the ALJ erred in giving no weight to
Dr. Froman's opinions.  Dr. Froman's opinions were inconsistent with
Dr. McKenna's opinions.  Neither Dr. Froman nor Dr. McKenna treated
Watts, and so, neither was entitled to greater weight than the other.
The ALJ could properly weigh the evidence from both sources and find
Dr. McKenna to be more persuasive.  The Court will not re-weigh this
evidence.[3]

Watts next argues that the ALJ erred in his credibility determination.
This Court will not review the credibility determinations of the ALJ unless
the determinations lack any explanation or support in the record.  Elder v.
Astrue, 529 F.3d at 413-14.   In this case the ALJ properly cited evidence in
the record to support his credibility findings.  The ALJ noted inconsistencies
in the record.  Watts told representatives at Blessing Hospital that she had
an eighth grade education, but she testified that she finished the tenth
grade.  Watts told Dr. Froman that she could neither read nor write, but she
testified that she got headaches when she read.  R. 19.   The ALJ also

---

[3]Watts also argues that the ALJ did not give enough weight to Dr. Kozma's
opinions.  Dr. Kozma diagnosed mixed type headaches.  Those findings were consistent
with Dr. McKenna's opinions, and so, do not provide a basis for reversal.

noted that Watts frequently said that she could not afford medication, but she knew how to obtain medical care through emergency rooms and clinics, and sometimes turned down care and left against medical advice. The ALJ found that her willingness to forego recommended treatment was inconsistent with her claims about the severity of her symptoms.  R. 19. The evidence cited by the ALJ supports his credibility finding.  The Court, therefore, will not disturb that finding.

Watts next argues that the ALJ gave an insufficient explanation for the basis for the RFC finding.  The Court disagrees.  The ALJ must at least minimally articulate his analysis of the relevant evidence.  Herron v. Shalala, 19 F.3d at 333.  He has done so.  The Appeals Council's RFC determination is consistent with the ALJ's explanation of the evidence in his Decision and the ALJ's formulation of his hypothetical question to Pagella at the hearing.  R. 5,17, 90-91.  The ALJ's explanation was sufficient.

Lastly, Watts argues that the ALJ posed an improper hypothetical question to vocational expert Pagella.  Watts argues that the ALJ erred because he did not base the question on Dr. Jennings' opinions.  The Court previously found that substantial evidence supported the ALJ's decision not to give controlling weight to Dr. Jennings' opinions.  The ALJ, thus, could properly disregard Dr. Jennings' opinions when formulating the hypothetical questions posed to the vocational expert.

WHEREFORE Plaintiff's Motion for Summary Judgment (d/e 15) is

DENIED, and Defendant Commissioner of Social Security's Motion for

Summary Affirmance (d/e 17) is ALLOWED.  The decision of the

Commissioner is AFFIRMED.  This case is closed.


ENTER:    August 1, 2012


_____*s/ Byron G. Cudmore*_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE